******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# ALEXANDER M. PHILLIPS *v.* TOWN OF HEBRON ET AL.
## (AC 42276)

Alvord, Moll and Bishop, Js.

*Syllabus*

The plaintiff, a minor child diagnosed with Down syndrome and without functional speech who was enrolled in the Hebron public school system, brought an action seeking damages from the defendants, the town of Hebron, the Board of Education, and eight of the board's employees, for, inter alia, negligence per se and statutory (§§ 46a-58 and 46a-75) discrimination. The plaintiff claimed that the defendants discriminated against him based on his disabilities by segregating him from students without disabilities and breached their duties to educate him in the least restrictive environment. The defendants filed a motion to dismiss the plaintiff's complaint on the ground that the plaintiff sought relief for the defendants' failure to provide special education services under the Individuals with Disabilities Education Act (20 U.S.C. § 1400 et seq.), thus triggering an administrative exhaustion requirement contained in that act and in the applicable state statutory (§ 10-76a et seq.) scheme that implements the federal act, thereby depriving the trial court of subject matter jurisdiction. The defendants specifically contended that, although the plaintiff did not allege a violation of the federal act, he sought relief for the denial of a free appropriate public education under the federal act and that, regardless of whether the complaint alleged a violation of the federal act, the federal act and state law (§ 10-76h) mandated exhaustion of administrative remedies insofar as the crux of the complaint was the alleged denial of a free appropriate public education. The trial court granted the motion to dismiss and rendered judgment thereon, concluding that the plaintiff was required to exhaust his administrative remedies but had failed to do so. On appeal to this court, the plaintiff claimed, inter alia, that he was not required to exhaust his administrative remedies because he did not allege a denial of a free appropriate public education and sought monetary relief, a remedy that was unavailable under the federal act. *Held*:

1. The plaintiff's appeal with respect to the defendant town and the board employees M and W was dismissed for lack of subject matter jurisdiction for lack of a final judgment, as the judgment of dismissal did not dispose of all causes of action against these defendants.

2. The trial court properly concluded that the plaintiff was required to exhaust his administrative remedies, the plaintiff's complaint having clearly sought relief for the denial of a free appropriate public education: this court relied on the framework set forth in the United States Supreme Court decision in *Fry* v. *Napoleon Community Schools* (137 S. Ct. 743), and adopted by our Supreme Court in *Graham* v. *Friedlander* (334 Conn. 564), in determining that, because the plaintiff's claims could not have been brought outside the school setting, the gravamen of the plaintiff's claims being that the defendants failed to educate the plaintiff in the least restrictive environment when it placed his desk and chair inside of a coatroom and did not permit him to spend a certain number of hours per week with children without disabilities, as provided for in his Individualized Education Plan, and that because the history of the proceedings prior to the filing of the complaint demonstrated that the plaintiff had invoked the formal procedures for filing a due process complaint under the federal act, the plaintiff sought relief for the denial of a free appropriate public education; moreover, the plaintiff could not avoid the exhaustion requirements under the federal act merely because he sought monetary damages; furthermore, the plaintiff was still required to follow the federal act's administrative procedures even though he could not be awarded monetary damages, as the exhaustion requirement requires a party to follow the administrative procedures, not that they be successful at any point in the process and, therefore, the plaintiff did not exhaust his administrative remedies when he began to pursue, but did not complete, the administrative remedies provided for under

the federal act.

Argued September 17—officially released December 22, 2020

*Procedural History*

Action to recover damages for, inter alia, negligence per se, and for other relief, brought to the Superior Court in the judicial district of Tolland, where the court, *Farley, J.*, granted the defendants' motion to dismiss and rendered judgment thereon, from which the plaintiff appealed to this court. *Appeal dismissed in part*; *affirmed.*

*Patricia A. Cofrancesco*, for the appellant (plaintiff).

*Alexandria L. Voccio*, for the appellees (defendants).

*Andrew A. Feinstein* filed a brief for the Council of Parent Attorneys and Advocates, Inc., as amicus curiae.

*Opinion*

ALVORD, J. The minor plaintiff, Alexander M. Phillips,[1] appeals from the trial court's decision granting the motion of the defendants, the town of Hebron (town), the Hebron Board of Education (board), and eight of the board's employees,[2] to dismiss counts one through twenty of the plaintiff's complaint for lack of subject matter jurisdiction on the basis of a failure to exhaust administrative remedies.[3] We dismiss the appeal with respect to counts two through six, eight, ten, twelve through sixteen, eighteen, and twenty for lack of a final judgment.[4] The judgment is affirmed in all other respects.

The following facts, as alleged in the plaintiff's operative complaint dated December 2, 2017, and procedural history are relevant to our review of this appeal. The plaintiff asserted the following allegations in paragraphs 1 through 16 of count one of his complaint. The seven year old plaintiff is a student at Gilead Hill Elementary School in Hebron (school). He has been diagnosed with Down syndrome and is without functional speech, and he has an individualized education program (IEP).[5] On February 25, 2015, Ralph E. Phillips, the plaintiff's father, visited the school to observe the plaintiff in his therapy session and activities. During his visit to the plaintiff's kindergarten classroom, the plaintiff and his assigned paraprofessional went into the coatroom, where there was a desk and chair for the plaintiff.

The plaintiff's father met with Joshua T. Martin, the Director of Special Education, on or about March 2, 2015. The plaintiff's father asked Martin how much time the plaintiff spends in the coatroom each day. Martin responded that he could not imagine why the plaintiff would have to be in the coatroom unless there was discrete testing going on and that he would look into the matter.

On March 25, 2015, a Planning and Placement Team[6] meeting was held. The participants included the plaintiff's father, Sheryl Poulin, the plaintiff's classroom teacher, and Margaret Ellsworth, the plaintiff's special education teacher. During the meeting, Poulin stated that the plaintiff naps in the classroom in the afternoon, wakes up by 2 p.m., and will then use the computer. When the plaintiff's father asked Poulin where the plaintiff naps, Ellsworth responded that he naps in the coatroom. A daily communication sheet, used by the plaintiff's father and the school, indicated that the plaintiff slept an average of 2.5 hours per day during the kindergarten year.

Also during the March 25 meeting, the plaintiff's father asked how much time the plaintiff spends in the coatroom doing his classwork or projects, and Ellsworth responded that he spent an average of about

forty minutes per day there. Ellsworth told the plaintiff's father that the plaintiff works in the coatroom because his projects require a lot of space, and there is not enough space in the classroom. She also stated that the plaintiff can be distracting to other children, and they can be distracting to him.

Prior to March 25, 2015, the plaintiff's father had not consented to or been notified of the plaintiff's desk and chair having been moved into the coatroom. The complaint alleged that "the practice of placing a child with a learning disability into a room away from nondisabled children is known as 'warehousing,' [which] is done due to low expectations by teachers of the child's ability to learn." Although the plaintiff's operative IEP, dated April 2, 2014, indicated that the plaintiff "will spend 26.33 hours per week with children/students who do not have disabilities," the plaintiff was spending approximately nine hours per week with children/students who do not have disabilities.

In the March 30, 2015 daily communication sheet, the plaintiff's father read that "Mrs. Poulin and I rearranged some of the furniture and moved [the plaintiff's] workspace into the classroom." On April 30, 2015, the plaintiff's father received a report card from the school that was blank, except for information as to the plaintiff's name, the classroom teacher's name, and the number of days the plaintiff was tardy.

Exhibits submitted to the court by the plaintiff, together with his opposition to the defendants' motion to dismiss counts one through twenty of his complaint, disclose the following additional facts concerning relevant administrative proceedings that preceded this action.[7] The plaintiff's counsel submitted to the state Department of Education, Bureau of Special Education (department) a Special Education Complaint Form (state complaint) and a Request for Impartial Special Education Hearing (request for due process hearing), both dated July 27, 2015. The plaintiff's counsel attached a complaint, which included the allegations described previously in this opinion and other allegations regarding the implementation of a feeding program for the plaintiff. The state complaint and the request for due process hearing did not identify any specific remedies sought. By way of amendment dated September 16, 2015, the plaintiff sought the following remedies: (1) a written explanation concerning the placement of the plaintiff in the coatroom; (2) the replacement of the feeding specialist; (3) unrestricted access to visit the school without advance notice; and (4) modifications to the plaintiff's IEP. By way of an e-mail dated September 24, 2015, the plaintiff's counsel communicated a request to amend the complaint to seek monetary damages. The plaintiff's state complaint was put in abeyance to allow the due process hearing to proceed, in accordance with applicable regulations.

By motion and accompanying memorandum of law dated October 6, 2015, the board sought dismissal of the request for a due process hearing "to the extent that such request seeks remedies not available under the [Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. (2012)] or accompanying state statutes and/or regulations." Specifically, the board sought dismissal of any request (1) for money damages, (2) for a written explanation of why the plaintiff's educational program was moved into the coatroom, and (3) that the board provide the plaintiff's father with unrestricted access to visit the school without advance notice. The motion did not seek the dismissal of the remaining remedies sought by the plaintiff, including the requested modifications to the plaintiff's IEP. In its accompanying memorandum of law, the board acknowledged that the plaintiff "has alleged that the board provided this young student with special education services in a more restrictive educational setting for part of the school day, instead of wholly within the regular education classroom. This claim is expressly based upon the provisions of the IDEA."

After the board filed its motion to dismiss, the plaintiff's father withdrew the request for a due process hearing. He requested that the department proceed with an investigation of the state complaint. The department completed its investigation and issued a report of its findings of fact and conclusions on March 14, 2016. The department concluded that "the district's use of the alcove space, its failure to communicate the use of this space to the parent and the miscalculation of the time the student spent with nondisabled peers did not result in a denial of a [free appropriate public education (FAPE)] to the student . . . ." In its final paragraph, the report stated that the parties may "request a due process hearing on these same issues through this office if a party disagrees with the conclusions reached in this investigation and meet the applicable statute of limitations." Following the issuance of the department's report, there was no further request made for a due process hearing. The plaintiff did file a complaint with the Commission on Human Rights and Opportunities (CHRO), which provided a release of jurisdiction on or about June 24, 2016.

The plaintiff commenced this action in September, 2016. On October 17, 2016, the defendants removed this case to the United States District Court for the District of Connecticut. On August 29, 2017, the District Court remanded the case back to the Superior Court after concluding that the complaint did not raise a substantial question of federal law.[8]

I

We deviate from our discussion of the facts and procedural history to address an issue of subject matter

jurisdiction. On September 8, 2020, this court issued an order to the parties to be prepared to address at oral argument whether this appeal should be dismissed with respect to the town, Martin, and Barbara H. Wilson, for lack of a final judgment.

"The jurisdiction of the appellate courts is restricted to appeals from judgments that are final. General Statutes §§ 51-197a and 52-263; Practice Book § [61-1]. . . . The policy concerns underlying the final judgment rule are to discourage piecemeal appeals and to facilitate the speedy and orderly disposition of cases at the trial court level. . . . The appellate courts have a duty to dismiss, even on [their] own initiative, any appeal that [they lack] jurisdiction to hear. . . .

"A judgment that disposes of only a part of a complaint is not a final judgment . . . unless the partial judgment disposes of all causes of action against a particular party or parties; see Practice Book § 61-3; or if the trial court makes a written determination regarding the significance of the issues resolved by the judgment and the chief justice or chief judge of the court having appellate jurisdiction concurs. See Practice Book § 61-4 (a)." (Citation omitted; internal quotation marks omitted.) *Tyler* v. *Tyler*, 151 Conn. App. 98, 103, 93 A.3d 1179 (2014).

In the present case, the operative complaint, dated December 2, 2017, contains thirty-two counts. Counts one, three, five, seven, and nine, all captioned "Discrimination," are alleged against the board, Martin, Wilson, Ellsworth, and Poulin, respectively. Counts eleven, thirteen, fifteen, seventeen, and nineteen, all captioned "Negligence per se," are alleged against the board, Martin, Wilson, Ellsworth, and Poulin, respectively. In counts two, four, six, eight, ten, twelve, fourteen, sixteen, eighteen, and twenty, the plaintiff seeks indemnification of the board and the individual defendants from the town pursuant to General Statutes § 7-465.

The defendants did not seek dismissal of counts twenty-one through thirty-two of the complaint, and those counts remain pending in the trial court.[9] Of those twelve counts that remain pending, several seek indemnification from the town, one is directed at Martin, and one is directed at Wilson. Because the judgment of dismissal did not dispose of all causes of action against the town, Martin, and Wilson, there is no final judgment under Practice Book § 61-3 with respect to those defendants. The appeal with respect to them is therefore dismissed.

II

Having dismissed the appeal in part, we next set forth the remaining relevant allegations of the operative complaint dated December 2, 2017. As noted previously, counts one, seven, and nine, asserted against the board, Ellsworth, and Poulin, respectively, are all captioned

"Discrimination" (collectively, discrimination counts). Counts eleven, seventeen, and nineteen, asserted against the board, Ellsworth, and Poulin, respectively, are all captioned "Negligence per se" (collectively, negligence per se counts).

In addition to the allegations set forth previously in this opinion, count one alleges that the plaintiff is a "member of a protected class and has a 'learning disability' and a 'physical disability' as defined by . . . General Statutes § 46a-51 (13) and (15)." It further alleges that the board, by and through its employees, "segregated the . . . plaintiff from other children/students without disabilities on the basis of the . . . plaintiff's disabilities." Count one alleges that the board, by and through its employees, "violated . . . General Statutes §§ 46a-58 (a)[10] and 46a-75 (a) and (b)[11] when it deprived the . . . plaintiff of his rights, privileges or immunities, secured or protected by the constitution or laws of this state or of the United States on account of the disabilities of the . . . plaintiff." (Footnotes added.)

Paragraph 20 of count one recites § 1412 (a) (5) (A) of the IDEA,[12] which provides: "To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." Paragraph 21 alleges that the board, by and through its employees, "deprived the . . . plaintiff's right to be educated in the least restrictive environment as provided by law." Paragraph 22 alleges that the plaintiff filed a complaint alleging discrimination with the CHRO and received a release of jurisdiction.

Counts seven and nine incorporate by reference paragraphs 1 through 20 of count one. In counts seven and nine, the plaintiff alleges that Ellsworth and Poulin knew or should have known that "the relocation of the . . . plaintiff, his desk and chair into a coatroom and placing him in the coatroom, because he was disabled, and leaving him to sleep throughout the afternoon while nondisabled children were educated in the classroom would deprive the . . . plaintiff of his rights, privileges or immunities, secured or protected by the constitution or laws of this state or of the United States." The plaintiff alleges that Ellsworth and Poulin violated §§ 46a-58 (a) and 47a-75 (a) and (b) by "exploiting the fact that the . . . plaintiff did not have functional speech and could not tell his father what had been happening to him, when it started or how it made him feel."

With respect to Ellsworth, the plaintiff specifically alleges in count seven that she created the daily and

weekly schedule for the plaintiff and "knew where the . . . plaintiff was at any given time during his school day based upon the schedule she created." The plaintiff alleges that Ellsworth met monthly with the plaintiff's father for progress meetings and never informed him that the plaintiff had been segregated from nondisabled children. With respect to Poulin, the plaintiff alleges in count nine that she "knew or should have known that the . . . plaintiff, his desk and chair were moved from her classroom into the adjacent coatroom [and that move] constituted wrongful segregation and violated the provisions of his IEP."

The negligence per se counts incorporate by reference paragraphs 1 through 20 of count one. In the negligence per se counts, the plaintiff alleges that the board, Ellsworth, and Poulin had a duty under 20 U.S.C. § 1412 (a) (5) to educate the plaintiff in the least restrictive environment. In count eleven, the plaintiff alleges that the board, "by and through its employees, analyzed the . . . plaintiff's daily and weekly schedules to calculate and determine the maximum amount of time wherein he would be educated with nondisabled children/students and set forth in the . . . plaintiff's IEP that he would spend at least [twenty-six] hours per week with nondisabled children." The plaintiff alleges that the board breached its duty under 20 U.S.C. § 1412 (a) (5) "by moving the . . . plaintiff, his desk and chair into a coatroom and placing him in the coatroom and leaving him to sleep throughout the afternoon while nondisabled children were educated in the classroom." The plaintiff alleges that the board "failed to act in accordance with [20 U.S.C. § 1412 (a) (5)] and subjected the . . . plaintiff to imminent harm to his academic and social development."

The plaintiff alleges in counts seventeen and nineteen that Ellsworth and Poulin breached their duty under 20 U.S.C. § 1412 (a) (5) as they "knew or should have known that the . . . plaintiff was not spending time with nondisabled children/students to the maximum extent possible." With respect to Ellsworth, the plaintiff alleges, upon information and belief, in count seventeen that she attended weekly team meetings regarding the plaintiff's progress and compliance with his IEP and that she "knew or should have known that, according to the schedule she set for the . . . plaintiff and her knowledge of the time the . . . plaintiff spent in the coatroom each day, he could not spend 26.33 hours per week with nondisabled children/students." The plaintiff alleges that Ellsworth's "acts and/or omissions subjected the . . . plaintiff to imminent harm and/or detriment to his academic and social development." With respect to Poulin, the plaintiff alleges in count nineteen that she "was a member of the Planning and Placement Team for the . . . plaintiff, had a duty under [20 U.S.C. § 1412 (a) (5)] to ensure the . . . plaintiff was educated in the least restrictive environment," that she knew

the plaintiff was not "spending time with nondisabled children/students to the maximum extent possible in her own classroom," and that her "acts and/or omissions subjected the . . . plaintiff to imminent harm and/or detriment to his academic and social development."

On January 17, 2018, the defendants filed a motion to dismiss counts one through twenty of the complaint and a memorandum in support of the motion, arguing that the court lacked subject matter jurisdiction on the basis that the plaintiff had failed to exhaust the administrative remedies available under the IDEA. Specifically, the defendants argued that because the discrimination and negligence per se counts "allege that the defendants failed to educate the . . . plaintiff in the least restrict[ive] environment, and as a result, caused harm to the . . . plaintiff's academic and social development, these counts are governed by the IDEA, and the plaintiff was required to exhaust his administrative remedies under 20 U.S.C. §§ 1415 (f) and (g). He has failed to do so. Therefore, these counts should be dismissed."

On March 22, 2018, the plaintiff filed a memorandum of law in opposition to the defendants' motion to dismiss and attached the exhibits referenced previously. In his opposition, the plaintiff argued, inter alia, that because he sought monetary damages, a remedy that is unavailable under the IDEA, for wrongful segregation, and he did not allege a denial of a FAPE, he was not required to exhaust his administrative remedies under the IDEA. With respect to his discrimination claims, the plaintiff argued, inter alia, that "the IDEA cannot be the sole and exclusive remedy for disability discrimination just because the plaintiff is a student" because "[t]he standard for accommodation by a public school system under the [Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 et seq.] are not coextensive with the FAPE requirements under IDEA . . . ." The plaintiff also argued that the IDEA's exhaustion requirement does not apply to the plaintiff's disability discrimination claims "brought pursuant to Connecticut General Statutes over which the IDEA has no authority or exhaustion requirement." With respect to his negligence per se claims, the plaintiff argued, inter alia, that such counts allege wrongful segregation, not a denial of FAPE, and that they use the least restrictive environment provision of the IDEA as the duty element only.

The court, *Farley, J.*, held oral argument on the motion to dismiss on May 29, 2018. On October 5, 2018, the court issued a memorandum of decision granting the defendants' motion to dismiss counts one through twenty.[13] The court concluded that the plaintiff's discrimination and negligence per se claims sought relief for a denial of FAPE and therefore were subject to the exhaustion requirement.[14] Because the plaintiff failed

to exhaust his administrative remedies before filing suit, the court found that it lacked subject matter jurisdiction and granted the defendants' motion to dismiss. On October 23, 2018, the plaintiff filed a motion for reconsideration. On October 26, 2018, the defendants filed an objection to the plaintiff's motion for reconsideration. On October 29, 2018, the court denied the plaintiff's motion for reconsideration. This appeal followed.

On appeal, the plaintiff claims that the court erred in granting the defendants' motion to dismiss on the basis that he failed to exhaust his administrative remedies.

Before addressing the merits of this appeal, we note that subsequent to the trial court's memorandum of decision and the filing of the briefs by the parties, this court sua sponte stayed consideration of this appeal pending our Supreme Court's decision in *Graham* v. *Friedlander*, 334 Conn. 564, 567, 223 A.3d 796 (2020). On March 3, 2020, this court lifted the appellate stay and ordered the parties to file supplemental briefs addressing the impact of that decision. It is appropriate to start with a discussion of that case, as it provides substantial guidance in resolving the present matter.

In *Graham*, parents of four children instituted an action against the Board of Education of the city of Norwalk and certain of its members, among other defendants. Id., 566. The plaintiffs brought state law claims in connection with the hiring of Spectrum Kids, LLC, and its owner, Stacy Lore, who had represented at the time she was hired that she "had received various master's degrees and was a board certified behavior analyst." Id., 568. None of the defendants performed a background check on Lore or confirmed her alleged credentials.[15] Id. Lore and Spectrum Kids were retained to provide the minor plaintiffs with autism-related services within the Norwalk public schools. Id., 569. The plaintiffs alleged that the "negligent and careless hiring and supervision of Lore proximately caused permanent and ongoing injuries and losses to their four children and to them individually as parents." Id. The trial court granted the defendants' motion to dismiss counts one through sixty of the plaintiffs' complaint on the basis that the plaintiffs had failed to exhaust their administrative remedies. Id., 569–70.

On appeal to the Supreme Court, the plaintiffs in *Graham* claimed that they were not required to exhaust administrative remedies because "their complaint advances a state law claim that does not allege a violation of the [IDEA]" and that they did "not seek relief for the denial of a FAPE but, rather, [they asserted] common-law claims of negligent hiring and supervision, loss of consortium and negligent infliction of emotional distress—all falling outside the exhaustion requirements contained in the [IDEA]." Id., 570.

The court in *Graham* first discussed the IDEA and its exhaustion requirements. "The [IDEA] is a federal statute that 'ensures that children with disabilities receive needed special education services.' *Fry* v. *Napoleon Community Schools*,        U.S.    , 137 S. Ct. 743, 748, 197 L. Ed. 2d 46 (2017); see also 20 U.S.C. § 1400 (d) (2012). 'The [IDEA] offers federal funds to [s]tates in exchange for a commitment: to furnish a  .  .  . [FAPE]  .  .  . to all children with certain physical or intellectual disabilities.' *Fry* v. *Napoleon Community Schools*, supra, 748. Once a state accepts the [IDEA's] financial assistance, eligible children acquire a 'substantive right' to a FAPE. Id., 749. The primary vehicle for providing each eligible child with a FAPE takes the form of an individualized special education plan. 20 U.S.C. § 1414 (d) (2012); *Fry* v. *Napoleon Community Schools*, supra, 749. . . .

"Disputes often arise over whether the special education services provided to children with physical or intellectual disabilities are sufficient to satisfy a child's individual education plan. To resolve these disputes, the [IDEA] requires state or local agencies to establish and maintain procedures to 'ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE] by such agencies.' 20 U.S.C. § 1415 (a) (2012); see *Fry* v. *Napoleon Community Schools*, supra, 137 S. Ct. 748. '[A] dissatisfied parent may file a complaint as to any matter concerning the provision of a FAPE with the local or state education agency (as state law provides).' *Fry* v. *Napoleon Community Schools*, supra, 749; see 20 U.S.C. § 1415 (b) (6) (2012). . . .

"The [IDEA] also contains an exhaustion requirement pursuant to which individuals cannot file a civil action under the [IDEA] until they have satisfied the procedural dispute resolution mechanism established by the relevant state agency. See 20 U.S.C. § 1415 (*l*) (2012). In relevant part, the statute provides: 'Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 . . . title V of the Rehabilitation Act of 1973 . . . or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures . . . shall be exhausted to the same extent as would be required had the action been brought under this subchapter.' 20 U.S.C. § 1415 (*l*) (2012).

"The plain language of the [IDEA] provides that exhaustion is required when a civil action is brought *'under such laws* . . . .' . . . 20 U.S.C. § 1415 (*l*) (2012). '[S]uch laws' plainly encompass the federal protections of the rights of children with disabilities embodied in the United States 'Constitution, the Ameri-

cans with Disabilities Act of 1990 . . . title V of the Rehabilitation Act of 1973,' and the act itself. 20 U.S.C. § 1415 (*l*) (2012); accord *Moore* v. *Kansas City Public Schools*, 828 F.3d 687, 693 (8th Cir. 2016)." *Graham* v. *Friedlander*, supra, 334 Conn. 572–73. Because the plaintiffs in *Graham* did not allege violations of the constitution or the IDEA or any other federal statute protecting the rights of children with disabilities, but rather alleged state common-law negligence claims, the court concluded that the plaintiff's claims were not subject to the federal exhaustion requirements. Id., 573–74.

The court in *Graham* next considered whether state law mandates exhaustion of administrative remedies where state law claims seek relief for the denial of a FAPE. Id., 574. In concluding that it does so mandate, the court looked to General Statutes § 10-76a et seq., which implements the substantive and procedural requirements of the IDEA. Id. "The specific procedures for resolving disputes are set forth in § 10-76h. Under § 10-76h (a) (1), a parent of a child requiring special education and related services 'may request a hearing of the local or regional board of education or the unified school district responsible for providing such services whenever such board or district proposes or refuses to initiate or change the identification, evaluation or educational placement of or provision of a [FAPE] to such child or pupil.' The request must be made in writing, contain a statement of the specific issues in dispute, and be requested within two years of the board's proposal or refusal to initiate a change in the child's education plan. General Statutes § 10-76h (a) (1) through (4).

"Upon receipt of the written request, 'the Department of Education shall appoint an impartial hearing officer who shall schedule a hearing . . . pursuant to the Individuals with Disabilities Education Act . . . .' General Statutes § 10-76h (b). Section 10-76h requires the Department of Education to provide training to hearing officers, delineates who may act as hearing officers and members of hearing boards, identifies the parties that shall participate in a prehearing conference to attempt to resolve the dispute, and describes the authority that the hearing officer or board of education shall have. See General Statutes § 10-76h (c) and (d). Section 10-76h also establishes the processes for appealing from decisions of the hearing officer or the board of education. Section 10-76h (d) (4) provides in relevant part: 'Appeals from the decision of the hearing officer or board shall be taken in the manner set forth in section 4-183' . . . . A plain reading of General Statutes § 4-183 of the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq., informs us that, prior to bringing a claim in Superior Court, individuals must exhaust all administrative remedies available within the relevant agency." (Footnote omitted.) *Graham* v. *Friedlander*, supra, 334 Conn. 574–75.

The court in *Graham* also emphasized that "the extensive administrative scheme established by the legislature supports our conclusion that parties asserting a state law claim and seeking relief for the denial of a FAPE must first exhaust administrative remedies pursuant to § 10-76h. It is a settled principle of administrative law that if an adequate administrative remedy exists, it must be exhausted before the Superior Court will obtain jurisdiction to act in the matter. . . . The exhaustion requirement serves dual functions: it protects the courts from becoming unnecessarily burdened with administrative appeals and it ensures the integrity of the agency's role in administering its statutory responsibilities." (Citation omitted; internal quotation marks omitted.) Id., 575–76. The court concluded "[o]n the basis of the statute's clear and unambiguous language, as well as the established and extensive administrative scheme . . . that the plaintiffs must exhaust administrative remedies before filing a claim for the denial of a FAPE under state law." Id., 576.

Having determined that plaintiffs must exhaust administrative remedies before filing a claim for the denial of a FAPE under state law,[16] the court in *Graham* "look[ed] to the essence, or the crux, of each of the plaintiffs' claims within the complaint to evaluate whether each claim seeks relief for the denial of a FAPE." Id., 577. In so doing, it considered the two factors outlined by the United States Supreme Court in *Fry* v. *Napoleon Community Schools*, supra, 137 S. Ct. 756. "The first factor requires consideration of whether the claim could have been brought outside the school setting," and "[t]he second factor requires consideration of the history of the proceedings prior to the filing of the complaint." *Graham* v. *Friedlander*, supra, 334 Conn. 580–81.

The first factor is evaluated on the basis of two hypothetical questions set forth in *Fry* v. *Napoleon Community Schools*, supra, 137 S. Ct. 756: "First, could the plaintiff have brought essentially the same claim if the alleged conduct had occurred at a public facility that was *not* a school—say, a public theater or library? And second, could an *adult* at the school—say, an employee or visitor—have pressed essentially the same grievance?" (Emphasis in original.) The court in *Fry* explained: "When the answer to those questions is yes, a complaint that does not expressly allege the denial of a FAPE is also unlikely to be truly about that subject; after all, in those other situations there is no FAPE obligation and yet the same basic suit could go forward. But when the answer is no, then the complaint probably does concern a FAPE, even if it does not explicitly say so; for the FAPE requirement is all that explains why only a child in the school setting (not an adult in that setting or a child in some other) has a viable claim." Id.

Under the second factor, the history of the proceed-

ings, "a court may consider that a plaintiff has previously invoked the IDEA's formal procedures to handle the dispute—thus starting to exhaust the [a]ct's remedies before switching mainstream." Id., 757. The initial choice to pursue the administrative process "may suggest that she is indeed seeking relief for the denial of a FAPE—with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy." Id. This inquiry depends on the facts. Id. "[A] court may conclude, for example, that the move to a courtroom came from a late-acquired awareness that the school had fulfilled its FAPE obligation and that the grievance involves something else entirely. But prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term." Id.

The court in *Graham*, applying the first factor outlined in *Fry*, answered the two hypothetical questions in the affirmative. It determined that the plaintiffs could have brought the same claim if they had attended a municipal summer camp that advertised a special needs program focused on certain therapies but was run by uncertified and unqualified staff. Id., 581. If the children suffered a regression in their development, they could claim that the negligent hiring of the staff proximately caused their injuries. Id., 581–82. As to the second hypothetical question, the court determined that "an adult participating in a municipally funded behavioral therapy treatment program offered in the evenings at a school could also bring the same claim for regression resulting from services provided by an uncertified and unqualified behavior therapist." Id., 582.

The court in *Graham*, viewing the complaint in the light most favorable to the plaintiffs, "read the complaint to allege that the board defendants negligently hired Lore, that the board defendants should have known of Lore's inability to provide services, and that Lore's failure to provide services directly and proximately caused injury to the children in the form of a regression unique to children suffering from autism spectrum disorder and an inability to communicate effectively. Viewed in this most favorable light, the claim sets forth an allegation for negligent hiring, not the denial of a FAPE, and thus is not subject to dismissal for failure to exhaust administrative remedies." Id., 586. The court additionally considered that the complaint lacked "any mention of the [IDEA], other laws protecting children with disabilities, or the children's education plans." Id., 587.

Turning to the second factor outlined in *Fry*, the court in *Graham* recognized that the plaintiffs never invoked the formal procedures of filing a due process complaint or requesting a hearing. Id., 588. Thus, the

history of the proceedings supported the court's conclusion that the plaintiffs sought relief for something other than a denial of a FAPE. Id.

Turning to the claim made in this appeal, we first set forth our standard of review. "Our review of the trial court's determination of a jurisdictional question raised by a pretrial motion to dismiss is de novo. . . . In this regard, a court must take the facts to be those alleged in the complaint, including those facts necessarily implied from the allegations, construing them in a manner most favorable to the pleader. . . . In undertaking this review, we are mindful of the well established notion that, in determining whether a court has subject matter jurisdiction, every presumption favoring jurisdiction should be indulged." (Citation omitted; internal quotation marks omitted.) Id., 571.

In his appellate brief, the plaintiff argues that his complaint "does not seek declaratory relief (the basic remedy for a denial of FAPE) nor injunctive relief (for an IDEA obligation) . . . ." He argues that his "educational goals and objectives are not the gravamen of his complaint," but, rather, that "[h]is claims are based in his wrongful segregation from typical kids: they were in the classroom; he, his desk and chair were in the coatroom–without the knowledge and consent of his father." The plaintiff addresses the two hypothetical questions outlined in *Fry* by arguing first that he could have brought a disability discrimination claim against a movie theater that required children with Down syndrome to sit in the balcony, apart from the general audience, and second, that an adult with Down syndrome could bring a claim of disability discrimination against a school for "requiring the disabled adult to use a different, nearby room to listen to the school chorus or band concerts," apart from the general audience seated in the auditorium.[17]

The defendants contend that the answers to the two hypothetical questions are no. The defendants argue that "[t]he plaintiff is challenging the provision of educational services to the . . . plaintiff . . . in regards to his IEP, and specifically in regards to the IDEA's requirements that students with disabilities be educated in the least restrictive environment, and that parents be notified of any progress and/or changes to their child's IEP. As in *Fry*, such a challenge could not be brought against a public facility other than a school, nor could it be brought by an adult visitor or employee in the school. The plaintiff could not, for instance, sue a library for failing to educate his son in [the] least restrictive environment or for failing to report on his academic progress because a library is not charged with the responsibility of educating his son at all. Similarly, an adult could not bring such a claim against a school."

We begin our analysis with an evaluation of the first factor, whether the plaintiff's claims could have been

brought outside of the school setting, as set forth in *Fry* v. *Napoleon Community Schools*, supra, 137 S. Ct. 756, and applied in *Graham*. The court in *Fry* offered two contrasting examples to illustrate whether the gravamen of a complaint against a school concerns the denial of a FAPE or instead addresses disability-based discrimination. Id. The court in *Fry* offered the example of a wheelchair-bound student suing his school for discrimination under Title II of the ADA because the building lacked access ramps. Id. Although the court recognized that the architectural feature has educational consequences, and therefore a different suit could allege that it violates the IDEA, the denial of a FAPE was not the essence of the Title II complaint. Id. It reasoned: "Consider that the child could file the same basic complaint if a municipal library or theater had no ramps. And similarly, an employee or visitor could bring a mostly identical complaint against the school. That the claim can stay the same in those alternative scenarios suggests that its essence is equality of access to public facilities, not adequacy of special education." Id. The court contrasted this example with one of a child with a learning disability who sues his school under Title II for failing to provide him with remedial tutoring in mathematics. Id., 756–57. The court explained: "That suit, too, might be cast as one for disability-based discrimination, grounded on the school's refusal to make a reasonable accommodation; the complaint might make no reference at all to a FAPE or an IEP. But can anyone imagine the student making the same claim against a public theater or library? Or, similarly, imagine an adult visitor or employee suing the school to obtain a math tutorial? The difficulty of transplanting the complaint to those other contexts suggests that its essence—even though not its wording—is the provision of a FAPE . . . ." Id., 757.

Applying this analysis to the plaintiff's allegations in his complaint, we answer no to both of the hypothetical questions that drive the analysis of the first factor. A plaintiff could not have brought essentially the same claims outside the school setting, nor could an adult at a school have pressed essentially the same grievance. We view the plaintiff's claims as falling much closer to those of the student who was deprived of remedial tutoring in mathematics than the contrasting example in *Fry* of a lack of access to public facilities.

We first discuss the plaintiff's discrimination claims. As noted previously, the plaintiff alleges in the discrimination counts that the board, by and through its employees, "segregated the . . . plaintiff from other children/students without disabilities on the basis of the . . . plaintiff's disabilities," in violation of §§ 46a-58 (a) and 46a-75 (a) and (b). He further alleges that Ellsworth and Poulin violated §§ 46a-58 (a) and 47a-75 (a) and (b) by "exploiting the fact that the . . . plaintiff did not have functional speech and could not tell his father

what had been happening to him, when it started or how it made him feel." Although these allegations, taken alone, could be made outside of the school setting, they must be read in context of the core allegations of the plaintiff's discrimination claims. In the discrimination counts, the plaintiff alleges that his operative IEP indicated that the plaintiff "will spend 26.33 hours per week with children/students who do not have disabilities," but that the plaintiff was spending approximately nine hours per week with children/students who do not have disabilities. The plaintiff recites § 1412 (a) (5) (A) of the IDEA, which provides that children with disabilities are to be educated, to the maximum extent appropriate, together with their nondisabled peers, and he incorporates the citation to 20 U.S.C. § 1412 (a) (5) (A) into each of his counts alleging discrimination. He further alleges in count one that the board, by and through its employees, "deprived the . . . plaintiff's right to be educated in the least restrictive environment as provided by law." The allegations against each employee defendant in counts seven and nine likewise incorporate, and expand upon, the allegation that the plaintiff was not spending the specified amount of time with nondisabled children set forth in his IEP. The plaintiff alleges that Ellsworth, having created the plaintiff's schedule, knew where the plaintiff was situated but failed to report this information to the plaintiff's father during monthly progress meetings. With respect to Poulin, the plaintiff alleges that the plaintiff's placement in the coatroom "constituted wrongful segregation and violated the provisions of his lEP."

Moreover, in the negligence per se counts, the plaintiff expressly grounds his claims on the defendants' breach of their duty under 20 U.S.C. § 1412 (a) (5) to educate the plaintiff in the least restrictive environment. In count eleven, the plaintiff alleges that the board "failed to act in accordance with [20 U.S.C. § 1412 (a) (5)] and subjected the . . . plaintiff to imminent harm to his academic and social development." He also alleges in counts seventeen and nineteen that Ellsworth and Poulin breached their duty under 20 U.S.C. § 1412 (a) (5), as they "knew or should have known that the . . . plaintiff was not spending time with nondisabled children/students to the maximum extent possible." Specifically, the allegations in count seventeen against Ellsworth reference her attendance at weekly team meetings regarding compliance with the plaintiff's IEP, and assert that she "knew or should have known that, according to the schedule she set for the . . . plaintiff and her knowledge of the time the . . . plaintiff spent in the coatroom each day, he could not spend 26.33 hours per week with nondisabled children/students." With respect to Poulin, the plaintiff alleges in count nineteen that she "was a member of the Planning and Placement Team for the . . . plaintiff [and] had a duty under [20 U.S.C. § 1412 (a) (5)] to ensure the . . . plain-

tiff was educated in the least restrictive environment." The plaintiff alleges in counts seventeen and nineteen that Ellsworth and Poulin's "acts and/or omissions subjected the . . . plaintiff to imminent harm and/or detriment to his academic and social development." We conclude that the gravamen of the plaintiff's claims—that the defendants failed to educate the plaintiff in the least restrictive environment—is a denial of a FAPE.

"The IDEA mandates that [t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 20 U.S.C. § 1412 (a) (5) (A) . . . . Educating a handicapped child in a regular education classroom . . . is familiarly known as mainstreaming. . . . We have underscored the IDEA's strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their [nondisabled] peers. . . . Nevertheless, we have also acknowledged that, [w]hile mainstreaming is an important objective, we are mindful that the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students. Under the [IDEA], where the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily, mainstreaming is inappropriate. . . . Understandably, courts have recognized some tension between the IDEA's goal of providing an education suited to a student's particular needs and its goal of educating that student with his [nondisabled] peers as much as circumstances allow." (Citations omitted; internal quotation marks omitted.) *P. ex rel. Mr. & Mrs. P.* v. *Newington Board of Education*, 546 F.3d 111, 119 (2d Cir. 2008).

The United States Court of Appeals for the First Circuit recently considered whether an action brought pursuant to Title II of the ADA, and alleging that the school system unnecessarily segregated students with mental health disabilities in a separate school, was subject to the IDEA's exhaustion requirement. *Parent/Professional Advocacy League* v. *Springfield*, 934 F.3d 13, 18 (1st Cir. 2019). It stated: "On its surface, the complaint pleads disability-based discrimination: it alleges that the defendants are violating the ADA by unnecessarily segregating students with mental health disabilities in a separate and unequal educational program. And the complaint never uses the term FAPE. Yet, the crux of the complaint is that the defendants failed to provide the educational instruction and related services that the class plaintiffs need to access an appropriate education in an appropriate environment. That is not a claim

of simple discrimination; it is a claim contesting the adequacy of a special education program." (Internal quotation marks omitted.) Id., 25. The court further looked to the complaint's allegations that the defendants were denying students the " 'opportunity to receive educational programs and services in the most integrated setting appropriate to their needs' " and that the school system was denying students the opportunity to benefit from educational services. Id. The court determined that such claims were "about obligations under the IDEA to educate students in the regular classroom with their nondisabled peers '[t]o the maximum extent appropriate,' " and "to offer students an appropriate educational benefit . . . ." Id. It explained: "These allegations are, in great part, simply another way of saying, in IDEA terms, that the school system has not provided the necessary special educational services to allow students to be educated in the [least restrictive environment]."[18] Id.; see also *M.A.* v. *New York Dept. of Education*, 1 F. Supp. 3d 125, 144 (S.D.N.Y. 2014) (claims that student was removed to hallway for separate instruction and was excluded from music class related to appropriate level of mainstreaming and were subject to exhaustion requirement).

Here, the plaintiff's allegations, read in the light most favorable to him, seek redress for the defendants' failure to provide a FAPE,[19] specifically, their violation of the IDEA's provision that the school educate the plaintiff in the least restrictive environment. Accordingly, the answers to the two hypothetical questions set forth in *Fry* are no—the plaintiff could not sue a public facility for failing to educate him in the least restrictive environment, nor could an adult sue the school on such a basis.[20]

We next turn to the second factor outlined in *Fry*, which "requires consideration of the history of the proceedings prior to the filing of the complaint." *Graham* v. *Friedlander*, supra, 334 Conn. 580–81. As noted previously, "prior pursuit of the IDEA's administrative remedies will often provide strong evidence that the substance of a plaintiff's claim concerns the denial of a FAPE, even if the complaint never explicitly uses that term." *Fry* v. *Napoleon Community Schools*, supra, 137 S. Ct. 757. In the present case, the plaintiff initially pursued administrative remedies. He filed with the department a state complaint and request for due process hearing, in which he alleged an abbreviated version of substantially the same factual allegations made in the present action. He also expressly alleged that he was denied a FAPE. Although the plaintiff elected to have his complaint investigated by the department, he withdrew his request for a due process hearing. Furthermore, upon completion of the department's investigation, it notified the plaintiff that the parties may "request a due process hearing on these same issues through this office if a party disagrees with the conclusions

reached in this investigation and meet the applicable statute of limitations." The plaintiff made no such request and instead filed the present action.

This factual framework resembles that which the United States Supreme Court in *Fry* described as an indicator of a claim requiring exhaustion. As the court in *Fry* explained, "[a] plaintiff's initial choice to pursue [the administrative] process may suggest that she is indeed seeking relief for the denial of a FAPE—with the shift to judicial proceedings prior to full exhaustion reflecting only strategic calculations about how to maximize the prospects of such a remedy." *Fry* v. *Napoleon Community Schools*, supra, 137 S. Ct. 757. Accordingly, we conclude that the history of the proceedings in the present case is additional evidence that the plaintiff's claims seek relief for the denial of a FAPE. Cf. *Graham* v. *Friedlander*, supra, 334 Conn. 588 (history of proceedings, specifically, fact that plaintiffs never invoked formal procedures of filing due process complaint or requesting hearing, supported conclusion that plaintiffs sought relief for something other than denial of FAPE).

Although not expressly claiming that an exception to the exhaustion requirement applies,[21] the plaintiff argues that exhaustion is not required because he "seeks no remedies available under the IDEA." He contends that his requests for monetary damages and attorney's fees compel the conclusion that he is not making a claim for the denial a FAPE. He maintains that "[i]f a plaintiff is seeking monetary damages, he or she couldn't possibly be making a claim for the denial of a FAPE, because only declaratory or injunctive relief is allowed."[22] The defendants respond that "[n]either the IDEA, nor Connecticut's implementing statutes, nor the corresponding regulations, carve[s] out an exception to the IDEA's exhaustion requirement for parents seeking monetary damages."[23]

"Despite the important public policy considerations underlying the exhaustion requirement, [our Supreme Court has] grudgingly carved several exceptions from the exhaustion doctrine. . . . [It has] recognized such exceptions, however, only infrequently and only for narrowly defined purposes. . . . One of the limited exceptions to the exhaustion rule arises when recourse to the administrative remedy would be demonstrably futile or inadequate." (Citations omitted; internal quotation marks omitted.) *Hunt* v. *Prior*, 236 Conn. 421, 432, 673 A.2d 514 (1996).

We disagree that the plaintiff was not required to exhaust his administrative remedies merely because he seeks monetary damages and attorney's fees. The United States Court of Appeals for the Second Circuit has held that the mere addition of a claim for damages "does not enable [a plaintiff] to sidestep the exhaustion requirements of the IDEA." *Polera* v. *Board of Education*, 288 F.3d 478, 488 (2d Cir. 2002); see also *Nelson*

*v. Charles City Community School District*, 900 F.3d 587, 594 (8th Cir. 2018) ("[T]he IDEA's exhaustion requirement remains the general rule, regardless of whether the administrative process offers the particular type of relief that is being sought. . . . As others have explained, if the [plaintiffs'] position were to prevail, then future litigants could avoid the exhaustion requirement simply by asking for relief that administrative authorities could not grant." (Citation omitted; internal quotation marks omitted.)); *Wellman* v. *Butler Area School District*, 877 F.3d 125, 136 n.10 (3d Cir. 2017) (fact that plaintiff could not recover compensatory damages he sought in lawsuit as part of administrative proceedings does not convert his claims into non-IDEA claims); *Z.G.* v. *Pamlico County Public Schools Board of Education*, 744 F. Appx. 769, 777 n.14 (4th Cir. 2018) (fact that plaintiffs also seek damages does not free them from obligation to exhaust administrative remedies).[24] This analysis, albeit derivative of the complementary federal jurisprudence, persuades us that the plaintiff's request for monetary damages in the present case does not permit him to avoid the exhaustion requirement.

Lastly, the plaintiff briefly argues that he did exhaust his administrative remedies.[25] As noted previously, § 10-76h (b) provides that, upon receipt of written request pursuant to subsection (a), "the Department . . . shall appoint an impartial hearing officer who shall schedule a hearing . . . pursuant to the Individuals with Disabilities Education Act . . . ." Following the due process hearing, an aggrieved party may bring a civil action in state court seeking judicial review of the decision. See § 10-76h (d) (4). Specifically, § 10-76h (d) (4) provides in relevant part: "Appeals from the decision of the hearing officer or board shall be taken in the manner set forth in [General Statutes § 4-183 of the Uniform Administrative Procedure Act, General Statutes § 4-166 et seq.]." Section 4-183 "informs us that, prior to bringing a claim in Superior Court, individuals must exhaust all administrative remedies available within the relevant agency." *Graham* v. *Friedlander*, supra, 334 Conn. 575.

The plaintiff argues that he "did seek administrative redress until it was apparent that an IDEA hearing officer could not award the one last remaining remedy he sought, so the claim for a due process hearing was withdrawn but the Connecticut State Department of Education was charged with investigating his claim. The . . . plaintiff . . . unlike [the plaintiff in *Fry*], gave the administrative process a chance, not once but twice, and yet the trial court still ruled he was required to exhaust administrative remedies 'regardless of the remedy requested.'" (Footnote omitted.) As the United States District Court for the District of Connecticut recently explained, however, "[t]o satisfy [the exhaustion] requirement, parties must simply follow IDEA's administrative procedures; they need not be successful

at any point of that process." *Doe* v. *Westport Board of Education*, United States District Court, Docket No. 3:18-CV-01683 (KAD) (D. Conn. February 21, 2020); see id. (finding nothing inconsistent about requiring parties to exhaust IDEA's administrative procedures when seeking relief for denial of FAPE before bringing Section 504/ADA claims if Section 504/ADA claims also seek relief for denial of FAPE). Accordingly, we reject the plaintiff's argument that he exhausted his administrative remedies.

The appeal is dismissed with respect to counts two through six, eight, ten, twelve through sixteen, eighteen, and twenty; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] We note that the present action was commenced on behalf of Alexander M. Phillips, through his father, Ralph E. Phillips. We hereinafter refer to Alexander M. Phillips as the plaintiff.

[2] The eight employees named as defendants are Timothy Van Tasel, Patricia Buell, Eric Brody, Margaret Ellsworth, Ellen Kirkpatrick, Joshua T. Martin, Barbara H. Wilson, and Sheryl Poulin.

[3] The Council of Parent Attorneys and Advocates, Inc., filed an amicus brief, in which it argued, inter alia, that exhaustion of administrative remedies was not required in the present case.

[4] See part I of this opinion.

[5] "'Individualized education program' or 'IEP' means a written statement for a child with a disability that is developed, reviewed and revised by an individualized education program team in accordance with the [Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 et seq. (2012)] and section 10-76d-11 of the Regulations of Connecticut State Agencies." Regs., Conn. State Agencies § 10-76a-1 (10).

"The IEP is the centerpiece of the [IDEA's] education delivery system for disabled children. . . . The IEP, the result of collaborations between parents, educators, and representatives of the school district, sets out the child's present educational performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that will enable the child to meet those objectives. . . .

"Connecticut must deliver each disabled child a [free appropriate public education (FAPE)] pursuant to the child's IEP. . . . Connecticut accomplishes this through its State Department of Education and the Board of Education for each school district in the [s]tate, each of which is responsible for developing an IEP for disabled children in its district." (Citations omitted; internal quotation marks omitted.) *Mr. P.* v. *West Hartford Board of Education*, 885 F.3d 735, 741 (2d Cir.), cert. denied,    U.S.   , 139 S. Ct. 322, 202 L. Ed. 2d 219 (2018).

[6] " 'Planning and placement team' or 'PPT' means the individualized education program team as defined in the IDEA and who participate equally in the decision making process to determine the specific educational needs of a child with a disability and develop an individualized education program for the child." Regs., Conn. State Agencies § 10-76a-1 (14).

[7] The defendants had no objection to the court considering the exhibits attached to the plaintiff's opposition in adjudicating the motion to dismiss.

[8] In remanding the matter, the District Court noted that, because it lacked jurisdiction, it "need not consider the issue whether [the] plaintiff has exhausted his remedies under the IDEA."

[9] The trial court summarized counts twenty-one through thirty-two as follows: "Some of counts twenty-one through thirty-two arise out of allegedly intrusive photographs taken by [board] employee Ellen Kirkpatrick and shared with a third party in May, 2016. In connection with this incident there are counts alleging civil assault by two defendants and negligence on the part of other defendants, who allegedly violated their duties to supervise others. There are also several counts incorporating the core factual allegations of counts one through twenty and alleging negligent supervision for both those events and the events underlying the claims of civil assault. The plaintiff asserts claims for indemnification against the defendant [town] in

connection with all of the claims of negligence in counts twenty one through thirty two."

[10] General Statutes § 46a-58 (a) provides: "It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the Constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, gender identity or expression, sexual orientation, blindness, mental disability, physical disability or status as a veteran."

[11] General Statutes § 46a-75 provides in relevant part: "(a) All educational, counseling, and vocational guidance programs and all apprenticeship and on-the-job training programs of state agencies, or in which state agencies participate, shall be open to all qualified persons, without regard to race, color, religious creed, sex, gender identity or expression, marital status, age, national origin, ancestry, intellectual disability, mental disability, learning disability, physical disability, including, but not limited to, blindness, or status as a veteran.

"(b) Such programs shall be conducted to encourage the fullest development of the interests, aptitudes, skills, and capacities of all students and trainees, with special attention to the problems of culturally deprived, educationally handicapped, learning disabled, economically disadvantaged, or physically disabled, including, but not limited to, blind persons. . . ."

[12] The complaint contains an apparent typographical error identifying the relevant section as 20 U.S.C. § 1412 (C) (5).

[13] The court first determined that the state statutes implementing the IDEA contain an exhaustion requirement. See *Graham* v. *Friedlander*, 334 Conn. 564, 574, 223 A.3d 796 (2020) (state law mandates exhaustion of administrative remedies where state law claims seek relief for denial of FAPE).

[14] The plaintiff also argued that the defendants were barred by the doctrine of judicial estoppel from arguing that the plaintiff was required to exhaust his administrative remedies. The board previously had moved to dismiss the request for due process hearing "to the extent that such request seeks remedies not available under the IDEA or accompanying state statutes and/ or regulations." The court rejected the plaintiff's judicial estoppel argument on the basis that a failure to exhaust administrative remedies deprives the court of subject matter jurisdiction and a party cannot waive the absence of subject matter jurisdiction. The court further stated that even if the doctrine of judicial estoppel could be invoked to preclude a challenge to a court's subject matter jurisdiction, the first and second requirements of the doctrine were not met in this case. The plaintiff does not challenge on appeal this aspect of the court's ruling.

[15] "[I]n a criminal action, Lore was charged with larceny, to which she pleaded guilty and was sentenced to three years in prison and five years of probation. See *State* v. *Lore*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CR-10-0125486-T (September 2, 2010)." *Graham* v. *Friedlander*, supra, 334 Conn. 568.

[16] In his principal appellate brief, which was filed prior to the release of our Supreme Court's decision in *Graham* v. *Friedlander*, supra, 334 Conn. 564, the plaintiff suggests that exhaustion of administrative remedies is not required simply because he "has not brought any *federal* claims against the defendants." (Emphasis added.) During oral argument before this court, however, the plaintiff's counsel stated that she does not dispute that there is a state exhaustion requirement. See *Graham* v. *Friedlander*, supra, 567 (state law mandates exhaustion of administrative remedies where state law claims seek relief for denial of FAPE).

[17] The plaintiff additionally argues in his brief that the District Court's memorandum of decision remanding the matter to the Superior Court, which stated that the plaintiff's claims "do not necessarily raise a question of federal law," should have "guided the resolution of the defendants' motion to dismiss." We disagree that the District Court's construction of the complaint *for purposes of determining whether it possessed removal jurisdiction* should have guided the trial court's resolution of the defendants' motion to dismiss, specifically, its determination of the gravamen of the plaintiff's claims for purposes of deciding whether state law required that the plaintiff exhaust his administrative remedies. The District Court's decision determined only that the plaintiff's case did not fall within the "special and small category of cases" in which a federal court must resolve a "substantial question of federal law in dispute between the parties." Moreover, the District Court expressly stated that it was making no determination of "whether [the] plaintiff has exhausted his remedies under the IDEA." Whether the

plaintiff was required to exhaust his administrative remedies clearly was a question for the Superior Court in the present case.

[18] The court in *Parent/Professional Advocacy League* v. *Springfield*, supra, 934 F.3d 26, noted that "claims that schools isolated or separated disabled students have been subjected to IDEA exhaustion where those claims allege that the effects of the isolation or separation were educational." We note that in the present case, the discrimination counts lack clear allegations of the effects of the segregation. The plaintiff alleges generally that the board, by and through its employees, violated "§§ 46a-58 (a) and 46a-75 (a) and (b) when it deprived [him] of his rights, privileges or immunities, secured or protected by the constitution or laws of this state or of the United States on account of the disabilities of the . . . plaintiff" and that that the board, by and through its employees, deprived him of his "right to be educated in the least restrictive environment as provided by law." The negligence per se counts, however, specifically allege that the board, by and through its employees, "failed to act in accordance with [20 U.S.C. § 1412 (a) (5)] and subjected the . . . plaintiff to imminent harm to his academic and social development."

[19] Accordingly, we reject the plaintiff's argument, made on appeal, that, because the department's investigator concluded that the plaintiff had not been denied a FAPE and this finding of fact was unchallenged by the plaintiff and the defendants, the "trial court was bound to defer to that finding of fact." The lack of an express allegation that the plaintiff was denied a FAPE does not foreclose the conclusion that the gravamen of the plaintiff's claims is the denial of a FAPE. As explained by our Supreme Court in *Graham*, the framework set forth in *Fry* v. *Napoleon Community Schools*, supra, 137 S. Ct. 743, provides guidance "in determining what types of allegations should be construed as claims for the denial of a FAPE, even if the plaintiff, through artful pleading, does not allege the denial of a FAPE in the complaint." *Graham* v. *Friedlander*, supra, 334 Conn. 580.

[20] The plaintiff contends that "[t]he defendants mistakenly believe that a violation of [least restrictive environment] equates to a denial of FAPE," and cites *R.F.* v. *Cecil County Public Schools*, 919 F.3d 237, 246 (4th Cir.), cert. denied,      U.S.     , 140 S. Ct. 156, 205 L. Ed. 2d 46 (2019). In that case, the United States Court of Appeals for the Fourth Circuit first considered the claim that the school had failed to educate the plaintiff in the least restrictive environment, where it provided most of her instruction in an intensive communication support classroom (ICSC) in which she was the only student. Id. The court determined that the plaintiff's placement in the ICSC was "reasonably calculated to enable [her] to make progress appropriate in light of [her] circumstances" and that she was afforded opportunities to interact with other first graders. (Internal quotation marks omitted.) Id., 246–47. The court concluded that she was not denied a FAPE, particularly in light of the special education teacher's position that the plaintiff "had trouble concentrating and accessing material in the general education population." Id., 247. The court concluded that the plaintiff "had opportunities to interact with her peers '[t]o the maximum extent appropriate,' given [her] unique circumstances and academic and behavioral needs." Id.

It next considered the claim that the school violated the IDEA by failing to follow the plaintiff's IEP, in that it changed the plaintiff's placement and began providing her with more instruction hours in the ICSC than was provided for in her IEP. Id. The court concluded that increasing the plaintiff's hours in the ICSC beyond those specified in her IEP without giving notice to her parents amounted to a procedural violation of the IDEA, but that it did not constitute a substantive violation because the plaintiff was not denied a FAPE as a result. Id., 248.

We fail to see how *R.F.* v. *Cecil County Public Schools*, supra, 919 F.3d 237, advances the plaintiff's position. Indeed, in that case, the plaintiff had exhausted her administrative remedies. Id. The court noted that "[a]s required under the IDEA, [the plaintiff's parents] first filed a due process complaint with Maryland's Office of Administrative Hearings, resulting in a hearing before an [administrative law judge]," which hearing addressed whether the school denied the plaintiff a FAPE or failed to offer her an IEP that would provide her with a FAPE. Id., 244. Following issuance of the administrative law judge's decision, the plaintiff challenged that decision in the federal district court. Id.

[21] The trial court likewise noted that "[t]he plaintiff has argued that the exhaustion requirement is not applicable to his claims, but has not alternatively asserted that any known exception applies."

[22] The plaintiff also argues that the trial court improperly used the " 'injury

centered approach' that was rejected by the United States Supreme Court in *Fry* [v. *Napoleon Community Schools*, supra, 137 S. Ct. 752]." In *Fry*, the court stated that "a suit must seek relief for the denial of a FAPE, because that is the only 'relief' the IDEA makes 'available,' " and, "in determining whether a suit indeed 'seeks' relief for such a denial, a court should look to the substance, or gravamen, of the plaintiff's complaint." Id. The trial court performed this analysis and, accordingly, we reject the plaintiff's argument.

[23] The United States Supreme Court declined to address the question of whether exhaustion is "required when the plaintiff complains of the denial of a FAPE, but the specific remedy she requests—here, money damages for emotional distress—is not one that an IDEA hearing officer may award?" *Fry* v. *Napoleon Community Schools*, supra, 137 S. Ct. 752 n.4.

[24] See also *Donohue* v. *Lloyd*, United States District Court, Docket No. 18-CV-9712 (JPO) (S.D.N.Y. June 1, 2020) ("the mere addition of a claim for damages (which are not available under the IDEA) does not enable [a plaintiff] to sidestep the exhaustion requirements of the IDEA" (internal quotation marks omitted)); *Ziegler* v. *Multer*, United States District Court, Docket No. 1:18-CV-0881 (GTS/CFH) (N.D.N.Y. November 14, 2018) ("plaintiff's request for monetary damages does not negate her obligation to request an impartial due process hearing prior to commencing this action"), report and recommendation adopted, United States District Court, Docket No. 1:18-CV-0881 (GTS/CFH) (N.D.N.Y. March 6, 2019).

[25] The plaintiff's obtaining of a release of jurisdiction from the CHRO does not lead to the conclusion that he exhausted his administrative remedies. Because we conclude that the plaintiff alleges denial of a FAPE, the Department of Education is the relevant administrative agency through which the plaintiff was required to proceed. See General Statutes § 10-76 (h); see also *Avoletta* v. *Torrington*, United States District Court, Docket No. 3:07-CV-841 (AHN) (D. Conn. March 31, 2008) (failure to request due process hearings under IDEA not excused by complaints filed with other agencies).